UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KIMBERLY A. JONES, | ) | |
| _Plaintiff,_ | ) | |
| | ) | |
| _vs._ | ) | 1:10-cv-1258-JMS-TAB |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| _Defendant._ | | |

## ENTRY REVIEWING THE COMMISSIONER'S DECISION

Plaintiff Kimberly Jones applied for Disability Insurance Benefits and Supplemental

Social Security Income (collectively, "disability benefits") from the Social Security

Administration in October 2006. In August 2009, following the denial of her applications, Ms.

Jones appeared at a hearing before Administrative Law Judge ("ALJ") Deborah Arnold. At the

hearing, Ms. Jones was represented by counsel. The ALJ denied Ms. Jones' request for benefits

in September 2009. The Appeals Council denied review of the ALJ's decision. [Dkt. 15-2 at 2.]

Ms. Jones now requests review of the ALJ's decision under 42 U.S.C. § 405(g).

## I.
### BACKGROUND[1]

Ms. Jones alleges that she was disabled as of April 7, 2006, [dkt. 15-6 at 7]; she was 32

years old on her alleged disability onset date and 36 years old on the date of the ALJ's decision.

[Dkt. 15- at 19-20.] Ms. Jones has a GED, [dkt. 15- 2 at 30], past relevant work as a cashier,

---

[1] Although Ms. Jones' medical history is extensive, the Court will only discuss those aspects of it that are relevant to her criticism of the ALJ's decision.

coder production/inspector food manufacturing, truck driver, sewing machine operator, and pick and pack worker, [*id.* at 19].

Ms. Jones applied for benefits because of problems with an injured ankle, low blood sugar and slow thyroid, anxiety, limited use of hands, leg and hip trouble, gastrointestinal reflux disease, bladder trouble, morbid obesity, and breathing problems. [Dkt. 15-6 at 7.]

**A) Medical Evidence**

**a. Physical Ailments**

In 2002, Ms. Jones fractured her ankle and had surgery as a result; the hardware from this operation was removed in 2006. [Dkt. 15-2 at 32; dkt. 15-7 at 29.]

On December 9, 2006, consulting physician Dr. Brandon Dickey examined Ms. Jones and noticed that she had mild difficulty getting on and off the exam table; had an antalgic gait; could not perform heel-toe and tandem walk due to her ankle fusion; had slightly reduced range of motion in her left wrist and no range of motion in her left fused ankle; and had slightly reduced grip strength, with normal fine finger manipulation. [*Id.* at 48-49.]

Treatment notes dated January 10, 2007 provide, among other things, that Ms. Jones had swelling in her left ankle, a markedly antalgic gait, and a weak left leg. [*Id.* at 89.] Also on January 10, state agency reviewing physician Dr. J. Sands opined that Ms. Jones could perform light work, lifting up to 20 pounds occasionally and ten pounds frequently; sit and/or walk about six hours in an eight hour workday; and push and/or pull without restriction. [*Id.* at 74-75, 80.] Three months later, Dr. Fernando Montoya affirmed Dr. Sands' opinion. [*Id.* at 109.]

Treatment notes dated March 7, 2007 show that Ms. Jones was diagnosed with chronic pain in her left ankle, episodic dizziness, a muscle spasm in her left calf and Achilles tendon, and

anxiety/depression. [*Id.* at 88.] She was prescribed Norco and Klonopin, referred to an orthopedist for her left ankle, and referred to a stress center for suicidal ideation. [*Id.* at 88.]

In April 2007, Ms. Jones saw orthopedist Dr. Steven Herbst, M.D. [Dkt. 15-10 at 28.] Dr. Herbst observed that she had a fairly solid fusion with some degenerative joint changes. [*Id.* at 28.] A CT scan showed degenerative joint disease in three areas of the ankle. [Dkt. 15-9 at 11.] The following month, Dr. Herbst opined that although the Ms. Jones' CT scan showed joint disease in three areas, she had a successful fusion surgery with no hardware abnormalities. [Dkt. 15-10 at 25-26.] Dr. Herbst suggested an ankle brace and injections as short-term treatment for Ms. Jones' pain, [*id.* at 25], and noted that if that option did not alleviate her pain, Ms. Jones' future options included progressive fusions, heavier bracing, or ankle replacement surgery, [*id.*].

In January 2008, Ms. Jones refilled a prescription for Lortab and Naproxen for her left ankle pain. [Dkt. 15-10 at 8.] In February, she had outpatient surgery to treat her heavy, irregular menstrual bleeding. [Dkt. 15-8 at 4-7.]

In June 2008, Ms. Jones complained to Dr. Richard Jones that she had been dizzy for the past two years; Dr. Richard Jones diagnosed her with chronic fluid in her ears and chronic inflammation of the middle ear in both ears. [Dkt. 15-8 at 35-36.]

Treatment notes dated July 14, 2008, noted that Ms. Jones had an antalgic gait, crutches, weak lower left extremities, and marked tightness in her left Achilles tendon. [Dkt. 15-10 at 6.]

In November 2008, Ms. Jones had her medications refilled; she complained of episodes of shakiness and lightheadedness, but she also indicated that these symptoms were relieved upon eating something. [Dkt. 15-10 at 4.]

### b. Mental Ailments

In December 2006, consulting psychologist Dr. Carrie Dixon performed a mental status examination, [dkt. 15-7 at 51-54], and noted that Ms. Jones walked independently; tended to her personal care with some occasional assistance getting dressed; cooked five times a week; did housework and laundry; and shopped for groceries. [*Id.* at 51-52.] Dr. Dixon diagnosed Ms. Jones with dysthymic disorder (or, melancholy mood) and anxiety disorder NOS; she gave Ms. Jones a Global Assessment of Functioning score ("GAF") of 60.[2]

In January 2007, State agency reviewing psychologist Dr. Joelle Larsen completed a Psychiatric Review Technique form ("PRTF"), in which she opined that Ms. Jones is credible and retains the ability to perform simple repetitive tasks for a sustained period of time from a mental/emotional standpoint. [Dkt. 15-7 at 71.] In an accompanying worksheet, however, Dr. Larsen checked boxes indicating moderate limitations concerning Ms. Jones' ability to complete a normal workday and workweek without interruptions from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to accept instructions and respond appropriately to criticism from supervisors. [Dkt. 15-7 at p.70, R. 264.] Three months later, State agency psychologist Dr. J. Gange, Ph.D. reviewed Ms. Jones' file and affirmed Dr. Larsen's opinion as written. [Dkt. 15-7 at 108.]

---

[2] The Global Assessment of Functioning scale rates a "clinician's judgment of the individual's overall level of functioning" on a scale of 0 to 100. *Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders*, Fourth Ed., Text Revision, 32, 34 (2000) (DSM IV-TR). A GAF rating of 31-40 indicates some impairment in reality testing or communication, or major impairment in several areas such as at work, family relations, judgment, thinking or mood. A rating of 41-50 represents serious symptoms (e.g. suicidal ideation) or any serious impairment in social, occupational functioning. A rating of 51-60 represents moderate symptoms. A rating of 61-70 indicates some mild symptoms or some difficulty in social or, occupational functioning, but generally functioning pretty well. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, p. 34, DSM-IV-TR (4th ed. 2000).

In March 2007, Ms. Jones referred herself to the Center for Mental Health for suicidal ideation. [Dkt. 15-7 at 94-107.] At an intake interview with social worker Deena Heller, Ms. Jones complained of short-term memory problems, no self-esteem or social skills, decreased energy, poor appetite, and insomnia. [Dkt. 15-7 at 102-03.] Ms. Jones also reported that she was taking Hydrocodone for pain, Klonopin for anxiety, Naproxen for arthritis, Synthroid for hypothyroidism, and Apri for heavy menstrual periods. [*Id.* at 100.] Ms. Jones indicated that she was recently prescribed Paxil, but had not started taking it. [*Id.*] At that time, Ms. Jones was wearing a boot and using crutches. [*Id.* at 102-103.] Ms. Heller diagnosed Ms. Jones with depressive disorder NOS and relational problem NOS with an Axis II diagnosis of personality disorder NOS; assigned her a GAF score of 45; and referred her to individual therapy until she could be linked with women's group therapy. [*Id.* at 103-07.]

In December 2007, Ms. Jones complained of being extremely forgetful, feeling like she was losing her mind, not having the will to get out of bed, and feeling very irritable due to pain. [Dkt. 15-11 at 8.] Ms. Jones was diagnosed again with depressive disorder NOS, with a secondary diagnosis of anxiety disorder NOS; a tertiary diagnosis of relational problem NOS; and an Axis II diagnosis of dependent personality disorder, and assigned a GAF score of 45. [*Id.*] The next month, Ms. Jones complained of breathing problems and feeling dizzy and forgetful and was continued on Paxil, Klonopin, and Naproxen. [Dkt. 15-10 at 10.]

**B) Ms. Jones' Testimony**

Ms. Jones testified that she used crutches occasionally since fracturing her left ankle in 2002. [Dkt. 15-2 at 31-32.] From 2006 through 2008, Ms. Jones worked off-and-on as a truck driver, which involved the use of a clutch. [Dkt. 15-2 at 14, 31; dkt. 15-7 at 28.]

She stated that at the time of the hearing she could sit for 20 minutes at a time; stand for 20 minutes at a time; walk without crutches for about one minute; walk with crutches for about three minutes; and carry fewer than 10 pounds. [*Id.* at 37-38.]

Ms. Jones indicated that she tries to help around the house by caring for her infant granddaughter, shopping for groceries, and doing the dishes, but that the pain makes these activities take a particularly long time. [*Id.* at 15-2 at 32-34.] She also stated she occasionally drove a car. [*Id.* at 34.] Ms. Jones' other activities include cooking, house cleaning, and laundry. [Dkt. 15-7 at 52.]

### C) Vocational Expert Testimony

The ALJ asked the vocational expert what jobs were available in the national economy for someone with Ms. Jones' background who could perform sedentary work; occasionally climb ramps or stairs, stoop, or crawl; never balance, walk on rough terrain, or climb ladders, ropes, or scaffolds; occasionally push or pull with the left foot and the upper extremities; and perform only simple, repetitive tasks. [Dkt. 15-2 at 40-41.] The vocational expert testified that such a person could perform the representative unskilled, sedentary job of charge account clerk (57,000 jobs nationwide, 200 jobs statewide). [*Id.* at 40-42.]

## II.
### STANDARD OF REVIEW

This Court's role in this action is limited to ensuring that the ALJ applied the correct legal standards and that substantial evidence exists for the ALJ's (and ultimately the Commissioner's) findings. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* Because the ALJ "is in the best position to determine the credibility of witnesses," *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008), this Court must afford the ALJ's

credibility determinations "considerable deference," overturning them only if they are "patently wrong," *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006).

If the ALJ committed no legal error and substantial evidence exists to support her decision, the Court *must* affirm the denial of benefits. Otherwise the Court will remand the matter back to the Social Security Administration for further consideration; only in rare cases can the Court actually order an award of benefits. *See Briscoe v. Barnhart*, 425 F.3d 345, 355 (7th Cir. 2005).

> When evaluating a disability claim, an ALJ must use the following five-step inquiry:
>
> (1) [is] the claimant…currently employed, (2) [does] the claimant ha[ve] a severe impairment, (3) [is] the claimant's impairment…one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment,…can she perform her past relevant work, and (5) is the claimant…capable of performing any work in the national economy[?]

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). To properly perform the analysis at Steps Four and Five, the ALJ must first find the disability claimant's residual functional capacity ("RFC"), or "the most [the claimant] can still do despite [his or her] limitations." 20 C.F.R. § 416.945(a).

At each step, the ALJ must consider all relevant evidence; if the ALJ rejects certain evidence, she must articulate the reasons for doing so. *Myles v. Astrue*, 582 F.3d 672, 677–78 (7th Cir. 2009). To the extent that conflicting evidence in the medical record would allow reasonable minds to differ, the responsibility to resolve those evidentiary conflicts belongs to the ALJ—not the Court. *See, e.g., Clifford v. Apfel*, 227 F.3d 863, fn. 4 (7th Cir. 2000) (holding that the ALJ, not the courts, resolves evidentiary conflicts).

### III.
### THE ALJ'S OPINION

At Step One of her analysis, the ALJ found that Ms. Jones had not engaged in substantial gainful activity since the onset date of her alleged disability.  [Dkt. 15-2 at 14.]  At Step Two, the ALJ found that Ms. Jones had severe impairments, but that she had no impairment or combination of impairments that medically equaled any of listed impairments at Step Three.  [*Id.* at 15.]  The ALJ also found that Ms. Jones' allegations concerning the intensity, persistence, and limiting effects of her symptoms were not credible.  [*Id.* at 17.]  Based on her impairments, the ALJ found that Ms. Jones had the RFC to perform a reduced range of sedentary work, with the following relevant limitations: she could lift 20 pounds occasionally and 10 pounds frequently; sit for six hours in an eight-hour workday, stand or walk for a total of two hours during the day; never walk on rough terrain; only occasionally push or pull with her left foot; perform only simple, repetitive tasks; perform no continual fingering (or, fine finger manipulation); and only occasionally push or pull with her upper extremities.  [*Id.* at 16.]  Given this RFC, the ALJ determined that Ms. Jones was able to perform work in the national economy, e.g., as a charge account clerk, and was therefore not disabled.  [*Id.* at 19-20]; *see also* 20 C.F.R. § 404.1520(g).

### IV.
### DISCUSSION

Ms. Jones argues that the ALJ erred by failing to consider whether she met or medically equaled the requirements for Listing 1.02; by making a flawed credibility finding; and by failing to articulate a function-by-function assessment of Ms. Jones RFC, in violation of SSR 96-8p.  [Dkt. 20 at 13-26.]

#### A)  Consideration of Listing 1.02

Ms. Jones first argues that the ALJ committed reversible error by failing to discuss Listing 1.02. Ms. Jones claims that she provided substantial medical evidence showing that her impairments met or medically equaled the requirements of that Listing.

A claimant is deemed disabled at Step Three if she has a condition with symptoms that meet or exceed the criteria of one or more of the Listed Impairments. 20 C.F.R. § 404.1520(d); 20 C.F.R. § 404 Subpt. P, App. 1. Alternatively, if the claimant's symptoms do not correspond exactly with a Listing's requirements, she can still be deemed disabled if medical evidence establishes that her symptoms are equal in severity and duration to those of a Listed Impairment. 20 C.F.R. § 404.1526(a), (b). The claimant has the burden to present medical findings that match or equal in severity all the criteria specified by a listing. *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. 2009) (citing *Ribaudo*); 42 U.S.C. § 423(d)(5)(A); 20C.F.R. § 404.1512(a). In light of the evidence the ALJ deems medically supported and credible, the ALJ determines whether the claimant met her burden of showing her impairments meet or are medically equal to any given Listing—in so doing, the ALJ should mention the specific Listings she considers. *Ribaudo*, 458 F.3d at 583.

Listing 1.02—major dysfunction of a joint—has four requirements. First, the claimant must have a "gross anatomical deformity." 20 C.F.R. § 404, Subpt. P., App. 1, Listing 1.02. A gross anatomical deformity may include "subluxation, contracture, bonyor fibrous ankylosis [or] instability"—in other words, dislocation of the joint, permanent shortening of the joint, severe joint stiffness, or buckling of the joint. *Id.* Second, the claimant must have chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint. *Id.* Third, there must be findings or acceptable medical imaging of, among other things, joint space narrowing. *Id.* Finally, the affected joint must *either* be a weight-bearing joint, such as a

hip, knee, or ankle, resulting in the inability to ambulate effectively, *or* a peripheral joint in each upper extremity resulting in an inability to perform fine and gross movements effectively. *Id.* Listing 1.00B2b(1) defines "ineffective ambulation" as having "insufficient lower extremity functioning to permit independent [walking] without the use of a hand-held assistive device that limits the functioning of both upper extremities," including two crutches. 20 C.F.R. § 1.00(B)(2)(b)(1).

The Court will address Ms. Jones' carpal tunnel syndrome and ankle impairment in turn.

**a. Ms. Jones' Carpal Tunnel Syndrome**

First, Ms. Jones argues that because she was diagnosed with carpal tunnel syndrome, the ALJ should have discussed it at Step Three. The ALJ, however, did not consider Ms. Jones' carpal tunnel to be a severe impairment at Step Two. [Dkt. 15-2 at 15.] Therefore, for Ms. Jones' challenge to have any logical teeth, it would be a Step Two challenge. [See dkt. 17 at 2 ("Plaintiff shall briefly set forth each of the legal issues that Plaintiff wishes the Court to consider—with specific reference to the applicable step established by 20 C.F.R. § 404.1520."). Ms. Jones makes no Step Two challenge here.

Furthermore, Ms. Jones makes no argument that elements three or four of Listing 1.02 are met here—she neither attempts nor makes any showing of joint narrowing in her wrist, or that her carpal tunnel exists in both hands, [dkt. 20 at 19 (citing 15-10 at 16 (showing diagnosis of *left* carpal tunnel syndrome))], or that her carpal tunnel syndrome actually results in an inability to perform fine and gross movements effectively, as required under Listing 1.02B2c, [dkt. 20 at 19-20 (citing dkt. 15-7 at 49 ("Fine finger function was within normal limits."))]. For a claimant to make a successful Step Three challenge, she must show that her impairment—to

the extent that one exists—meets *all* the requirements of a given Listing. *See, e.g., Suffy v. Astrue*, 2011 WL 1706139, *5 (N.D. Ill. 2011). Ms. Jones makes no such showing here.

Moreover, even if the ALJ should have—and failed to—address Ms. Jones' carpal tunnel at Step Three, the ALJ's RFC determination in fact accounted for Ms. Jones her carpal tunnel syndrome by limiting her to no continual fingering and to only occasionally pushing or pulling with her upper extremities. [Dkt. 15-2. at 16.] If any error occurred at Step Three, then, it was harmless. *Sanchez ex rel. Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("[E]rrors, if harmless, do not require (or indeed permit) the reviewing court to upset the Agency's decision."). The Court therefore finds Ms. Jones' argument that her carpal tunnel syndrome meets the requirements of Listing 1.02 unavailing and turns its attention to her ankle impairment.

### b. Ms. Jones' Ankle Impairment

Although the ALJ did not specifically mention Listing 1.02, the ALJ did make findings of fact relevant to an analysis of whether Ms. Jones' ankle impairment meets this Listing. First, the ALJ noted Ms. Jones' "significant [] history of fracture and fusion to the left ankle." [Dkt. 15-2 at 17.] Second, the ALJ acknowledged Ms. Jones' statement that she had limited use of her ankle, legs, knees and hips because of severe pain, noting that "she testified that she can only stand for 10 minutes or walk for [one] minute without crutches." [Dkt. 15-2 at 16.] Additionally, the ALJ referenced the fact that in 2006, Consulting Physician Dr. Brandon Dickey, M.D., found Ms. Jones to have a limp and to be unable to perform heel walk, toe walk, or tandem gait. [*Id.*] Likewise, the ALJ mentioned that in January 2007, an office note indicated that she had a "markedly antalgic gait." [*Id.*]

The ALJ also noted, however, that by her April 2007 physical examination, Ms. Jones "was able to walk without assistance and had normal heel-to-toe gait patterns without a limp." [*Id.*; *see also* dkt. 15-10 at 28.]  Moreover, as the ALJ articulated, a CT scan taken at that time revealed a "successful ankle arthrodesis" (or, joint ossification between two bones after surgery that is performed to heal a fracture) and no hardware complications.  [*Id.*]  Finally, the ALJ noted that Ms. Jones' orthopedic surgeon suggested only a supportive athletic brace as a short-term solution to support her subtalar joint.  [*Id.*]

With respect to the first element of Listing 1.02, the Commissioner is correct to point out that arthrodesis does not constitute a major anatomical deformity.  In fact, Listing 1.03 expressly addresses surgical arthrodesis of a major weight-bearing joint.  20 C.F.R. § 404, subpt. P, app. 1.  Ms. Jones does not respond to the Commissioner's argument, nor does she raise a Listing 1.03 issue.

With respect to element four, the ALJ determined that—despite Dr. Parmenter's 2006 report, [dkt. 15-7 at 28]—Ms. Jones could walk without assistance by April 2007.  [Dkt. 15-2 at 16.]  Once again, the role of the Court in this action is not to reweigh the evidence or resolve evidentiary disputes—those determinations are squarely within the purview of the ALJ.  *See, e.g., Clifford*, 227 F.3d at fn. 4.  The ALJ's determination that, based on the record, Ms. Jones could "ambulate effectively" precludes her from meeting the fourth requirement of Listing 1.02.

Ms. Jones also notes that the ALJ failed to mention the fact that Ms. Jones' April CT scan indicated the potential for degenerative joint disease.  [Dkt. 15-9 at 11; dkt. 20 at 20.]  However, this evidence does not constitute any requirement of Listing 1.02, *see* 20 C.F.R. § 404.1525(d); the ALJ's failure to mention it is therefore harmless.  *Sanchez ex rel. Sanchez,* 467 F.3d at 1082-83 (7th Cir. 2006).

In sum, Ms. Jones does not present evidence showing that she meets all the requirements of Listing 1.02; the Court thus finds that the ALJ's failure to mention this Listing does not warrant remand. *See Barnett*, 381 F.3d at 668. ("[G]iving the ALJ the benefit of the doubt, we infer from his written decision that he correctly recognized the applicability of [the Listing].").

### B) The ALJ's Credibility Determination

Ms. Jones also contends that the ALJ erred in determining that her testimony regarding her pain was not credible because she did not list out the factors of SSR 96-7p, as required. [Dkt. 20 at 14-17, 18.]

As a preliminary matter, the ALJ's credibility determination is entitled to special deference. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004); *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006) ("Credibility determinations can rarely be disturbed by a reviewing court, lacking as it does the opportunity to observe the claimant testifying."). Although the absence of objective evidence cannot, standing alone, discredit the presence of substantive complaints, *Parker v. Astrue*, 597 F.3d 920, 992-23 (7th Cir. 2010), when faced with evidence both supporting and detracting from claimant's allegations, the Seventh Circuit has recognized that "the resolution of competing arguments based on the record is for the ALJ, not the court." *Donahue v. Barnhart*, 279 F.3d 441, 444 (7th Cir. 2002). Therefore, this Court will not disturb a credibility finding "unless it is 'patently wrong in view of the cold record.'" *Pope v. Shalala*, 998 F.2d 473, 487 (7th Cir. 1993) ("[Because] the ALJ is in the best position to observe witnesses, [courts] usually do not upset credibility determinations on appeal so long as they find some support in the record and are not patently wrong.").

In evaluating a claimant's credibility, the ALJ must first determine whether the symptoms alleged are supported by objective medical evidence that could reasonably produce

such symptoms. 20 C.F.R. § 404.1529(c)(3). If so, the ALJ must evaluate the credibility of the claimant's subjective statements as to the intensity, persistence, and functionally limiting effects of the symptoms—considering such factors as daily activities; the location, duration, frequency, and intensity of symptoms; precipitating and aggravating factors; medications taken; and treatment. 20 C.F.R. § 404.1529(c)(3). As Ruling 96-7p states, the credibility determination must contain specific reasons for the finding and be supported by the evidence in the case record.

The ALJ in the instant case found that Ms. Jones' medically determinable impairments "could reasonably be expected to cause the alleged symptoms," but that "her statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent that they were inconsistent with the RFC found."[3]

In so doing, the ALJ considered Ms. Jones' statements that she could only stand for 10 minutes or walk for one minute without crutches; was suicidal; and had difficulty concentrating. [Dkt. 15-2 at 16-19.] The ALJ also considered third-party function reports from Ms. Jones' husband, her former employer, and her aunt. [*Id.* at 16-17.] Additionally, she considered Ms. Jones' daily living activities, including tending to her personal care, cooking five nights a week, cleaning, doing laundry, grocery shopping, reading, and watching TV. [Dkt. 15-2 at 18; dkt. 15-6 at 29.]

The ALJ also considered medical evidence including both the mild/normal results and the more limiting results from consulting physician Dr. Dickey's examination; office notes indicating that Plaintiff had a markedly antalgic gait; CT scans showing a successful left ankle

---

[3] The Court is mindful, as the ALJ should be, that the Seventh Circuit is critical of employing this type of "meaningless boilerplate" in rendering credibility determinations. *See McClesky v. Astrue*, 606 F.3d 351, 352 (7th Cir. 2010). As the Seventh Circuit considers such language meaningless, the Court will not consider it. The result does not change, however, because of the lengthy analysis undertaken by the ALJ.

fusion surgery; and an MRI showing mild arthropathy and slight arthritis in Plaintiff's left hand. [*Id.* at 17-18.] She further noted Ms. Jones' conservative course of post-surgical treatment for her fused left ankle. [*Id.* at 17.]

Ms. Jones argues that the ALJ's discussion is inadequate. Specifically, she argues, the ALJ's consideration of her daily life activities exposes the ALJ's failure to acknowledge Ms. Jones' testimony that the activities mentioned are particularly challenging for her. [Dkt. 20 at 16.] But even that testimony establishes that Ms. Jones is able to do these activities successfully, albeit slowly.[4]

Ms. Jones also contends that the ALJ did not adequately consider her testimony that she could only stand for 10 minutes or walk for one minute without crutches. [Dkt. 15-2 at 16.] However, the ALJ noted this testimony and found that it was inconsistent with the fact that Ms. Jones continued to work as a trucker after her ankle fusion surgery. [Dkt. 15-2 at 14, 18.] As the Seventh Circuit has noted, sometimes when a disability claimant continues to work, it "cuts against [her] claim that [s]he was totally disabled," *Berger v. Astrue,* 515 F.3d 539, 546 (7th Cir. 2008)—this is particularly true where the work involves a driving semi truck with a clutch across the country, [dkt. 15-7 at 28; dkt. 15-2 at 14, 31].

Additionally, Ms. Jones argues that the ALJ failed to mention any of the medications she takes to alleviate pain or other symptoms, or to mention their side-effects. [Dkt. 20 at 15.] Specifically, Ms. Jones claims that she has been "prescribed strong narcotic medications including hydrocodone and norco for pain, klonopin for anxiety, synthroid for low thyroid,

_____

[4] Ms. Jones states that "as to the location, duration, frequency, and intensity of [Ms. Jones'] pain, there is no discussion at all. [Dkt. 20 at 16.] Having reviewed the ALJ's opinion, however, the Court finds otherwise. [Dkt. 15-2 at 16-17 ("The claimant alleges . . . pain in her ankle, hands, legs, knees and hips. She testified she can only stand for 10 minutes or walk for 1 minute . . . the claimant stopped working in [] 2005 because she could not stand for any length of time.").]

naproxen for arthritis, apri for menorrhagia, and paxil for depression." [Dkt. 15-7 at 100.] But Ms. Jones gives the Court no explanation (other than mentioning the two times she suffered "dizziness and tiredness") that any of the medications she has been prescribed during the relevant time impacts her functioning. Given that there is no argument or evidence to the contrary, the Court finds this error to be harmless. *Sanchez*, 467 F.3d at 1082-83.[5]

Likewise, Ms. Jones argues that the ALJ gave short shrift to the fact that she uses crutches; however, the ALJ did discuss Ms. Jones' use of crutches, [dkt. 20 at 17; dkt 15-2 at 18], and noted that they were only suggested by her physician immediately after her surgery for her short-term recovery.[6] He also noted Ms. Jones' claim that she needed to use crutches when she walks for more than a minute, but she found this inconsistent with the medical evidence as a whole, including Ms. Jones' 2007 physical examination. [See dkt. 15-2 at 16-18.]

In light of the ALJ's discussion, the Court cannot find that the ALJ's credibility analysis was cursory; nor has Ms. Jones presented evidence that the analysis was patently wrong. *Pope v. Shalala*, 998 F.2d at 487. The ALJ did not err in rendering a negative credibility determination.

---

[5] Ms. Jones also cites Social Security Ruling 03-02p for the proposition that chronic pain and its corresponding medications may affect an individual's ability to maintain concentration and attention, as well as adversely affect her cognition, mood, behavior, and motor reactions. [Dkt. 20 at 16-17.] But Ms. Jones points to no evidence that her pain makes it hard to concentrate, nor does she make any argument that she is negatively impacted by any medications prescribed for a diagnosis of chronic pain. As the Seventh Circuit has repeatedly held, "it is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones." *Bank of Am., N.A. v. Veluchamy*, 643 F.3d 185, 190 (7th Cir. 2011).

[6] Ms. Jones cites *Parker v. Astrue*, for the quote, "[a]bsurdly, the administrative law judge thought it suspicious that the plaintiff uses a cane, when no physician had prescribed a cane. A cane does not require a prescription; it had been suggested to the plaintiff by an occupational therapist." 597 F.3d 920, 922 (7th Cir. 2010). The *Parker* quote, however, does little to advance Ms. Jones' claim, as the Seventh Circuit in that case still acknowledged that a medical professional suggested the walking device. Ms. Jones makes no claim that such any medical professional suggested she use a walking device after her immediate recovery from her ankle surgery. *Cf.*, *Id.* at 922.

### C) The ALJ's RFC Assessment

Finally, Ms. Jones claims that the ALJ erred by failing to perform a function-by-function assessment of her RFC as required by SSR 96-8p, [dkt. 20 at 25], and by failing to articulate available jobs for Ms. Jones in light of SSR 96-9p, [*id.* at 26].

When determining an individual's RFC, the ALJ "must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545. . . ." The ALJ need only discuss "limitations or restrictions;" accordingly, the ALJ need not engage in a function-by-function discussion of activities for which no impairment is present. *Zatz v. Astrue*, 2009 U.S. App. LEXIS 21915, *11-12 (7th Cir. 2009) ("[A]n ALJ need not provide superfluous analysis of irrelevant limitations or relevant limitations about which there is no conflicting medical evidence."). In rendering her RFC determination, the ALJ must provide a narrative discussion describing how the evidence supports each conclusion concerning:

> . . . the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

SSR 96-8p.

The ALJ in this case found that Ms. Jones could perform a reduced range of sedentary work, with the restrictions that she could life 20 pounds occasionally and ten pounds frequently; sit for six of eight hours and stand for a total of two of eight hours; never walk on rough terrain; only occasionally push or pull with her left foot and arms; and not engage in continual fingering. [Dkt. 15-2 at 16.]

**A)  Challenge to Mental RFC**

In terms of her mental RFC, Ms. Jones first argues that the ALJ failed to credit Dr. Larsen's Psychiatric Review Technique form ("PRTF"), wherein she marked that Ms. Jones had moderate limitations in her abilities to complete a nofrmal workday without interruptions from psychological symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to follow instructions and respond appropriately to criticism from supervisors.  [Dkt. 15-7 at 70; dkt. 20 at 24.]

Although Dr. Larsen found Ms. Jones to have moderate limitations in three out of 20 enumerated abilities on her PRFT, the doctor explicitly translated her findings to a written RFC opinion that Ms. Jones "retained the ability to perform simple, repetitive tasks for a sustained period of time from a mental/emotional standpoint."  [Dkt. 15-7 at 65, 69-70]; *see Johansen v. Barnhart*, 314 F.3d 283, 286-89 (7th Cir. 2002).  Indeed, the state agency reviewing psychologists—the only mental health professionals to opine as to her mental limitations— agreed that Ms. Jones could perform simple, repetitive tasks.  The ALJ adopted their written opinions.  [Dkt. 15-2 at 15.]  And Ms. Jones makes no argument that the ALJ afforded their opinions improper weight.

Ms. Jones next argues that the ALJ failed to address her own testimony regarding short-term memory loss, [dkt. 15-7 at 102], or her testimony that she sometimes had to make a restroom break every hour to change her menstrual pad.  [Dkt. 15-8 at 5; dkt. 20 at 25.]   As for the short-term memory loss, the ALJ properly relied upon the opinions of the State agency evaluators.  With respect to her menstruation issues, Ms. Jones herself testified that she had had surgery "to help that."  [Dkt. 15-2 at 31.]  The Court cannot find that the ALJ erred by giving Ms. Jones' testimony little weight to the extent that it contradicted the medical evidence.  *Simila*

*v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009) (holding that the ALJ need only include limitations in her RFC determination that are "supported by the medical evidence and that the ALJ found to be credible").

Finally, Ms. Jones argues that the ALJ failed to consider the fact that she was diagnosed with severe Depressive Disorder NOS, Relational Problem NOS, Personality Disorder NOS, moderate anxiety, and a GAF of 45 (indicating serious symptoms or any serious impairment in social or occupational functioning). [Dkt. 15-7 at 103, dkt. 20 at 23.]   However, the ALJ noted Ms. Jones had largely normal mental status examinations in both March 2007 and December 2007.  [Dkt. 15-2 at 18, 102-03; dkt. 15-11 at 18-19.]  Again, it is not the role of the Court to reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.  *Clifford,* 227 F.3d at 869.  Furthermore, "nowhere do the Social Security regulations or case law require an ALJ to determine the extent of an individual's disability based entirely on his GAF score."  *Denton v. Astrue,* 596 F.3d 419, 425 (7th Cir. 2010), *Wilkins v. Barnhart*, 69 F. App'x 775, 780 (7th Cir. 2003).

The Court finds that the ALJ supported her mental RFC determination with substantial evidence and properly articulated a function-by-function assessment to the extent that Ms. Jones' mental limitations might impair her work.

### B)  Challenge to Physical RFC

In terms of her physical RFC, Ms. Jones argues that the ALJ erred by failing to articulate a function-by-function assessment of Ms. Jones' "ability to do the full panoply of physical work-related activities, without taking [more] breaks [than are] sanctioned in a typical workplace setting."  [Dkt. 20 at 25.]

Here, the state agency reviewing physicians, who were the only physicians of record to opine as to Ms. Jones' functional limitations, suggested less restrictive work environments than the ALJ ultimately deemed appropriate. [Dkt. 15-2 at 18 (State agency doctors [] opined that the claimant can sit, stand, or walk for about six hours in an eight hour day and unlimitedly push and/or pull, which is overly simplistic in light of clinical and laboratory findings. . . . Giving the claimant the benefit of the doubt, the undersigned further reduced the RFC . . .".]

The ALJ thus fulfilled her burden to make a function-by-function assessment where she found the claimant to be impaired, *Zatz*, 2009 U.S. App. LEXIS 21915 at *11-12; furthermore, to the extent that any error is present, it the RFC was over-inclusive and thus benefitted Ms. Jones—accordingly, any error in the RFC assessment is harmless. *See Barnett*, 381 F.3d at 668.

Although an "evidentiary deficit" behind an ALJ's chosen RFC is reversible error, *Suide v. Astrue*, 2010 WL 1508510, at *6 (7th Cir. 2010), the ALJ need not articulate every piece of evidence in a claimant's record; rather, the ALJ simply needs to construct "an accurate and logical bridge between the evidence and the result." *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996). The Court finds that the ALJ constructed such a bridge here. And the Court further infers from the fact that the ALJ ultimately gave Ms. Jones more restrictions than even her physicians recommended, that she not only based her disability finding on substantial evidence, but that went beyond the medical evidence of record to accommodate Ms. Jones' symptoms.

### C) Challenge to ALJ's Failure to State Available Job Opportunities

Finally, Ms. Jones argues that the ALJ failed by citing examples of jobs Ms. Jones could do and the incidence of such work in the national economy, as required by SSR 96-9p.

SSR 96-9p states, "Where there is more than a slight impact on the individual's ability to perform the full range of sedentary work, if the adjudicator finds that the individual is able to do

other work, the adjudicator must cite examples of occupations or jobs the individual can do and provide a statement of the incidence of such work in the region where the individual resides or in several regions of the country." SSR 96-9p.

Here, the ALJ did follow SSR 99-6, explicitly articulating that Ms. Jones could be a "Charge Account Clerk, DOT # 205.367.014, with 57,000 jobs in the national economy and 200 jobs in the state of Indiana." [Dkt. 15-2 at 20.] The Court therefore finds Ms. Jones' argument on this point unavailing.

**V.**
**CONCLUSION**

"The standard for disability claims under the Social Security Act is stringent . . . . Even claimants with substantial impairments are not necessarily entitled to benefits, which are paid for by taxes, including taxes paid by those who work despite serious physical or mental impairments and for whom working is difficult and painful." *Williams-Overstreet v. Astrue*, 2010 U.S. App. LEXIS 2604, *5 (7th Cir. 2010) (per curiam). Furthermore, the standard of review of the Commissioner's denial of benefits is narrow. Taken together, the Court can find no legal basis to overturn the Commissioner's decision that Ms. Jones does not qualify for disability benefits. Therefore, the decision below is **AFFIRMED**. Final judgment will be entered accordingly.

09/02/2011

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribute via ECF only:**

Charles D. Hankey
charleshankey@hankeylawoffice.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE

tom.kieper@usdoj.gov